Good morning, Your Honors. May it please the Court, my name is Cresta Daly. I represent Mr. Harris, the petitioner on this matter. This case was previously before this Court and remanded with directions to the District Court to have a hearing to consider whether or not an unconstitutional search, if the same evidence would have been inevitably discovered by law enforcement or whether or not the attenuated basis doctrine applies. And we submit that neither of those doctrines would rescue this search. The basic facts are that law enforcement responds to a 911 call. They enter an apartment without consent. They do a protective sweep. That's the first search. That search has been held to be constitutionally sound. Officers become concerned by the demeanor of an individual in the apartment, later identified as Mr. Harris. They determine to handcuff him. They ask him questions. He's uncooperative. And Officer Canepa then performs a second so-called protective sweep, during which he finds a substantial amount of crack cocaine in a kitchen. Whether or not the second search is sufficiently attenuated from the first search is the issue that we have to consider. And the Supreme Court has set forth five factors by which to evaluate whether or not there is a sufficient attenuation. The first of those factors, that was set forth in the Seccolini case. The first of those five factors is whether or not the information that is subsequently obtained by law enforcement was given by that individual's own free will and not tainted by the illegal search. The information that law enforcement ultimately obtains from a woman by the name of Phoenicia Evans is both Mr. Harris's name and the fact that he She's living in the apartment, and the drugs that are found are found in Plainview. There are scales, sorry, A-scale and baggies, which are also found in Plainview. Ms. Evans, when police first arrive, Ms. Evans is uncooperative. She's asking the police officers to please leave her home. She is doing so at the direction of Mr. Harris, but she is nonetheless asking them to leave. She's not providing them with any information about herself or Mr. Harris. And, in fact, she only becomes cooperative with law enforcement after the discovery of the narcotics. Officers acknowledged that given the quantity of narcotics that they discovered, that somebody was likely going to jail that day. So by the time Ms. Evans begins to cooperate with law enforcement, she, too, is aware that someone's getting arrested, and she has incentive to make sure that it is not her who is getting arrested. Counsel, Judge Gould, if I could just interject a quick question. What bothers me about this case is the issue of inevitable discovery. If the police are going there on a domestic violence call to 911, how would it be conceivable that after seeing this guy look through the window at the door or whatever, that they wouldn't inquire on his name and then do a check and find out he is on probation and that they can search? We would agree that law enforcement absolutely would have asked those questions. They would have asked Mr. Harris's name, his probationary status, and they would have made the same inquiry of Ms. Evans under the inevitable discovery doctrine. But that only answers the first half of the question, right? It says what law enforcement would do. But what isn't answered by the state of the record is what Mr. Harris or Ms. Evans's responses would have been but for the discovery of the cocaine. Okay, right. But if they asked Mr. Harris for his name and he refused to give it after the information that they had gotten on a domestic violence call and what the witness saw, wouldn't they have a right then to enter under exigent circumstances? They'd have to make sure that the spouse or girlfriend was not in danger of this guy. They had already determined by the time the second search occurs, they had already determined that Ms. Evans was not currently in danger. When they approach the apartment, they don't hear any signs of a struggle. They go into the apartment. They do the protective sweep. They see that Ms. Evans is not in distress. She does not appear injured. Furniture is not overturned. There's no holes in the wall. There's clearly no act of struggle going on. They subsequently handcuff Mr. Harris because he is highly agitated. And I think in the police officer's opinion, his level of agitation is inconsistent with the facts as they know them to exist. If they hadn't found the cocaine, logically they would have continued questioning both Mr. Harris and Ms. Evans, not only about their identities but also about this alleged domestic violence incident. But there's no evidence to suggest that Ms. Evans would have responded in a cooperative manner to law enforcement. I mean, she's the person that prior to the cocaine being discovered, she's telling them to get out of her apartment. Mr. Harris says his name is Jay. Go look it up. And he's on probation. Go look it up. He's trying to get out of the apartment and get the officers out of the apartment. And law enforcement during the evidentiary hearing admitted that women are, in particular, are uncooperative with law enforcement when they're conducting a domestic violence investigation because the women don't want to see their significant others going to jail. And so we have a situation at the outset where Ms. Evans is being uncooperative with law enforcement, and the government had the burden of proof by a preponderance of the evidence to show that but for the discovery of the cocaine, Evans's demeanor would have changed such that she would have cooperated and provided that information to law enforcement. I don't quite follow that. I'm sorry. If she was being uncooperative, then why wouldn't that trigger them checking out to see who this guy is? They would have continued to try to figure out who he is. We agree with that. But the issue is when would they have learned that information and how would they have learned that information? There's no reason to think Ms. Evans would have provided that information. She wasn't being cooperative. So logically, they would have taken Mr. Harris, they would have arrested him, put him in the back of the police car, taken him downtown, fingerprinted him, and in a day or two, they would have known that he was in fact John Harris, by which time the drugs in that apartment would have been long gone, candidly. So they wouldn't know who he was. They wouldn't know who he was. They had no way, absent Ms. Evans saying that is John Harris and he lives here, and absent there's after they discover the drugs and figure out who he is, there's yet another search where they find some indicia with Mr. Harris's name on it. That never would have been discovered. They can't ask him for identification? They could have asked him for identification. They never did. There's no proof that he would have provided them with identification. There's no proof that he even had identification. So what logically would have happened is Harris would have been taken to jail, and they had no, based on what they knew at the time, they had no ability to freeze the scene, to go get a warrant. So every indication is that the drugs would have been gone by the time they returned. Do you want to reserve some time? I would, Your Honor, but is there a question? Go ahead. I do not.  Thank you. I'd like to reserve. Thank you. Good morning, Your Honors. James Connolly on behalf of the United States, and may it please the Court, the government would like to offer a few points in rebuttal. But when the officers arrived, they came between Fornicia Evans and her assailant. Once they removed him from the room, she was free to answer their questions and answer them honestly. She knew John Harris's name. She had been under duress by him. They had had a report of actual violence against her, and they had removed that man from the room, and she was able to answer their questions as to who he was and the fact that he lived there. Before he was removed, he was steering her answers. He was telling her what to say. He was telling her to tell the officers to leave. Once he was removed from the room, after he tried to bolt, she no longer told the officers to leave. And her statement, which is included at SER 209 and P10, indicates that she gave his name. She indicated that he had lived there, been living there for some time, and that he was, in fact, her estranged husband. But as I understand Ms. Daly's argument, in considering the inevitable discovery rule, the Court would have to consider the fact that Ms. Evans only answered these questions after the evidence was discovered, and she was concerned about potential charges against her. Two things in regard to that. First of all, John Harris had admitted to officers while she was in the room that he was on parole, and so she could safely assume that he would be gone and he was going to be arrested. Also, he was the one who had been violent to her in public, and that's what had triggered the 911 call. Secondly, this argument that Ms. Evans herself was a drug dealer is not found in the record. There was as in it was never proven, because it was, in fact, proven at trial that it was Mr. Harris whose cocaine that was. And indeed, it was the finding of the Court below that Mr. Harris was the one hiding that cocaine in the kitchen. Ms. Evans was not near it. So it is merely speculation to say that she was also a drug dealer and she was then covering for herself. In addition, there is this clear indication that he, while in the room, is steering her answers and telling her what to say, not simply out loud, but also mouthing the words to her. It's a very threatening and coercive environment. But he is removed, and as soon as he is removed, she is able to speak. Thank you. In addition, the officers, as they testified back in 2014 at the suppression motion then, and they testified again in the evidentiary hearing in 2017 that this Court had ordered, they were clear that their investigation was going to be persistent, that they were going to identify, they needed to identify these people, not simply as a matter of protocol, but as a matter of their experience, their training, that they would need to identify the parties, who they were to each other, whether or not they lived there. And they were going to search, because a domestic violence call requires an investigation at that level. They had heard reports of violence from inside the apartment. And while the defense argues that they had seen no signs of a struggle, the defense is describing a period of time that is seconds, if not a couple of minutes. They had not had a chance properly to assess the environment. They had begun their domestic violence investigation by coming in, asking Mr. Harris' name, asking his parole status. And from there, they were going to need to search further to see if there were signs of struggle, if there were other victims, and indicia of who these people were to each other, what their relationship was. And all of these things led to the court's finding below, which is amply supported by the record, that they were going to do a full and complete domestic violence investigation, especially in a case like this, where they had had violence reported. And as the court found below, her motivation for giving his name might have been that she didn't want to be dragged across the parking lot by her hair anymore. There had been actual violence done to this individual. And so it is a far stronger finding in the record that that is why she would be willing to give his name, rather than the idea that the drugs for which he was ultimately convicted somehow belonged to her. So the purpose of our—so why did we remand, then, in our prior decision? To determine whether or not the police would have engaged in that investigation had they not found the cocaine in the kitchen. Because the domestic violence investigation began before they found that cocaine. It was then put on pause after Mr. Harris bolted for the door. It then resumed once he was in the car and Officer Sabra was running the records check on him. But Officer Canepa and, indeed, Ms. Evans both testified that once Mr. Harris was removed from the room, the domestic violence investigation questions continued. This is an odd case. So are you saying that they would, even without knowing who he was, they would have conducted an illegal search of that? What would have been an illegal search of the house if he hadn't been on probation? No, Your Honor. What I'm saying is they would have seen to it that they identified the parties. They needed a reason and a right to search the apartment. The reason comes from the domestic violence report and the report of violence coming from inside the apartment, or the sounds of it. And the right came from the fact that he was on searchable probation and parole. And so that's what this Court's question was aimed at, was would they have conducted an investigation sufficient to get — well, actually, they say sufficient to discover the information they ended up discovering, which was that he was on searchable probation and parole and that he lived there. And that gave them the right to search. The Court seems to take for granted that they would have got his name. And, indeed, the Court below found the same, that his name would have been part of the evidence that they had turned up. Now, as it happens, this investigation, as I said, was thorough. These officers were not only trained to do this. This was these individual officers' MO, was to support the evidence of domestic violence. And in doing so, they would have discovered his name. In addition, they interviewed neighbors at the scene, neighbors who knew Mr. Harris as well. So the further inquiry would have revealed Mr. Harris' name and his parole status. But where is the connection to that — to lead the officer to believe that he resides there if they had continued this investigation? I'm sorry, can you repeat the question? I'm sorry. So when they — so you offer some evidence as to why officers would have discovered Mr. Harris' parole status if they continued this detailed domestic violence investigation. But how would they have obtained, during that investigation, how would they determine that he resides there? Because there's two questions, right? Who was he and did he live there? Yes. Understood. So once they have his name, a records check is going to be a matter of course, almost by reflex. And so that's how they're going to discover his parole status. His searchable parole status, right? Searchable parole status, correct. And then it was their interviewing of Ms. Evans, who was now free to answer their questions without duress now that he had been removed. That revealed that he lived there. And indeed, as this court found the first time this case was examined, they did in fact have probable cause to believe that he lived there. I thought in that earlier case, counsel, that they said there was clothing in the apartment or other indications he was residing there. Yes, indeed. Once they found his searchable status and once they engaged in the search, they found men's clothing, men's shoes in his size. They found keys on the couch where he had been sitting, which Ms. Evans later indicated to them were in fact his keys to the apartment. There were several indicators that he had been living there. But first and foremost, it was Ms. Evans during the domestic violence investigation who told them so. All right. Thank you. And if Your Honors have any further questions, I'm happy to answer them. Otherwise, the government will submit. Thank you. No questions here. Thank you. I'd like to address a couple of comments, excuse me, that Mr. Connolly made, one of which was that Mr. Harris stated that he was on probation, not parole. And the distinction is important for a couple of reasons. Parole is necessarily searchable. All parole conditions are searchable. Mr. Harris was on probation. There is searchable and non-searchable probation. And at the evidentiary hearing, the officers admitted that knowing somebody is on probation is insufficient to justify a search because they have to know the distinction between those conditions. As far as whether or not Phonesha Evans is a drug dealer, in the further excerpts of the record, there is testimony at approximately pages 14 and 15 from a man named Sergio Solis who testifies that he had gone to Ms. Evans' home on a number of occasions, purchased drugs from her and from her boyfriend. Mr. Solis did not know the legal name of the boyfriend, but identified him, I believe, as D-Boy. And he was asked, do you know who Mr. Harris is? He said he did. Is Mr. Harris the same person as D-Boy? He said no, those are two different individuals. So there is uncontroverted evidence in the record that Phonesha Evans was, in fact, herself a drug dealer. Domestic violence investigation doesn't give officers the right to conduct a full search of a home, which seems to be what the government is implying. Certainly, the officers have the ability to go into the home and conduct a protective sweep for officer safety, but that doesn't give them the opportunity to look for paperwork or other indicia of who might be living there. So the issue becomes, if they don't, I mean, the government seems to assume that somehow this protective sweep and this questioning is going to reveal Mr. Harris' name. But there is no evidence of how that is supposed to happen, and that is the government's burden, and they failed to meet it. Thank you, counsel. The case just argued is submitted for decision. We'll hear the next case on the calendar is United States v. Luckap, and that case is submitted on the briefs. It is so ordered. The next case for argument is Kauffman v. Queens Valley Medical School.
judges: Schroeder, Gould, Du